UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUZANNE PEIRSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 04 C 7734 |
| v. | ) |
| | ) Judge Joan B. Gottschall |
| LUCENT TECHNOLOGIES INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Suzanne Peirson ("Peirson") sued Lucent Technologies Inc. ("Lucent") under the Americans with Disabilities Act of 1990 ("ADA," or "the Act"), 42 U.S.C. § 12101 *et seq*.[1] Peirson alleges that Lucent discriminated against her in violation of the Act by terminating her employment on the basis of her alleged disability, a sleep disorder. Peirson also claims that Lucent violated the ADA by failing to accommodate her alleged disability. Lucent has moved for summary judgment. For the reasons below, the motion for summary judgment is granted.

**I. Background**

Peirson began working as a Communications Equipment Installer for Lucent in March 1997.[2] Originally stationed at Lucent's New Jersey office, Peirson asked to be transferred to Lucent's

---

[1] Peirson's complaint also contains references to Title VII of the Civil Rights Act of 1964 ("Title VII"). These are considered typographical errors, however, and Peirson concedes that she is not seeking relief pursuant to Title VII. (Peirson Dep. at 259; D.56.1 at ¶ 133).

[2] An installer is an employee who moves from one customer's location to another, installing and maintaining networking and personal computer equipment.

location in Naperville, Illinois, in February 2001, because she wanted to be closer to her significant other, who lived in Peoria, Illinois. Lucent granted the request and Peirson settled in Ottawa, Illinois, a town located about sixty miles from Lucent's Naperville site. The approximate travel time between Peirson's home and Lucent's Naperville location, using highways, is about one hour and twenty minutes.

Peirson was required to be at work by 7:00 a.m., Monday through Friday. Although she had never experienced such problems before, Peirson claims that, starting in October 2001, she began having trouble waking up early enough to arrive at work on time. In some cases, she failed to show up for work entirely. After several such instances, Michael Goss ("Goss"), Peirson's direct supervisor at the Naperville site, began subjecting Peirson to disciplinary action in accordance with Lucent's "Attendance Control Plan." On May 16, 2002, after several absences and episodes of tardiness, Goss issued a verbal warning to Peirson. After several more instances of tardiness, he issued additional verbal warnings in June and July 2002. In July 2002, Peirson applied for leave pursuant to the "FMLA,"[3] asking that she be allowed to take the leave in fifteen minute increments on the days on which she was late to work so that she would not be found in violation of Lucent's attendance policy. The request was denied.

On September 17, 2002, Peirson met with a member of Lucent's medical department regarding her difficulties sleeping and waking up. Peirson was given several suggestions to help her report to work on time, including setting multiple alarm clocks in a sequential manner, and having a friend or family member call to wake her up. Peirson rejected these suggestions, stating that she

---

[3] Peirson's briefs refer to the "FLMA." The court assumes, however, that Peirson's brief contains a typographical error and that the reference in fact is to the "FMLA," the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*.

had already tried them and that they did not work. Peirson continued periodically to be absent or late for work during this time.

In the fall of 2002, Peirson told Goss that her doctor suspected that she might have a sleep condition and that her doctor wanted her to undergo a sleep study. On approximately September 18, 2002, Goss offered Peirson a modified work schedule according to which Peirson would be allowed to report to work at 8:00 a.m. rather than 7:00 a.m., and would require her to work one hour later in the afternoon. Peirson rejected the offer.

On approximately November 19 and 20, 2002, Peirson was examined by Dr. Sarah Zallek, a physician at Saint Francis Medical Center's Sleep Disorder Center in Peoria, Illinois. During the examination, Peirson underwent a "polysomnogram" and a "multiple sleep latency test."[4] Dr. Zallek concluded that Peirson's "sleep testing was relatively unremarkable." Dr. Zallek speculated that Peirson "may have" had "delayed sleep phase syndrome," explaining that she could not reach a conclusive diagnosis due to other factors that may have affected Peirson's sleep, such as Peirson's excessive caffeine use.[5] Dr. Zallek advised Peirson to eliminate her caffeine use, get closer to eight hours of sleep per night, and undergo "bright light therapy" in the morning.

By January 2003, fewer than two months after her visits to Dr. Zallek, Peirson's sleep condition had significantly improved. Indeed, by July 2003, the condition was "no longer a problem," and Peirson did not attend a follow-up appointment that she had made with Dr. Zallek. Peirson's continued use of light therapy has greatly alleviated her symptoms. On rare occasions

---

[4] The parties do not define any of the medical terms or describe what is entailed by any procedures referred to in their briefs.

[5] During her employment with Lucent, Peirson consumed 40-60 ounces of caffeinated coffee and 48 or more ounces of caffeinated soda per day. Pl.'s 56.1 Resp. ¶ 123.

when the light machine has malfunctioned, however, Peirson has had difficulties waking up. Dr. Zallek has confirmed that she does not know whether Peirson ever suffered from a sleep condition, but that, in any event, Peirson does not presently suffer from any symptoms of any such condition.

In all, from October 2001 until her termination in April 2003, Peirson was late for work (by ten minutes or more) on thirteen separate occasions, and was absent on eleven separate occasions.[6] Peirson ultimately received two verbal warnings, five formal warning letters, a two-day suspension, a five-day suspension, and two ten-day suspensions. She was terminated on or about April 17, 2003. Importantly, it is undisputed that neither of the absences or incidents of tardiness that occurred after November 1, 2002 were due to Peirson's alleged sleep condition.

## II.     Discussion

### A.     Legal Standard

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In the consideration of a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Grifin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir. 1991). Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, "set [ting] forth specific

---

[6] On several of these occasions, Peirson was absent on several consecutive days. Under Lucent's Attendance Control Plan, however, absences on consecutive work days are regarded as a single occurrence. Hence, while Peirson actually missed fifteen days of work, she was formally cited for only eleven separate absences.

facts showing that there is a genuine issue for trial." *See, e.g.*, *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56). The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Albiero*, 246 F.3d at 932 (internal quotations and citations omitted).

### B. Qualified Individual With A Disability

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) she is a qualified individual with a disability; (2) that her work met the legitimate expectations of the defendant; (3) that she suffered an adverse employment action; and (4) that she was treated differently from a similarly situated employee. *See, e.g.*, *Morrisey v. Health Care Service Corp.*, No. 02 C 3150, 2004 WL 42369, at *5 (N.D. Ill. Jan. 7, 2004). Similarly, to prevail on a failure to accommodate claim, a plaintiff must show that (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed reasonably to accommodate the disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). Both claims require a plaintiff show that she is a "qualified individual with a disability." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). Lucent contends that Peirson's claims founder on this threshold requirement. The court agrees.

The regulations implementing the ADA make clear that a person cannot be regarded as a "qualified individual with a disability" under the Act where he or she has rejected a reasonable accommodation offered by his or her employer:

> A qualified individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. *However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability*.

29 C.F.R. § 1630.9(d) (emphasis added); *see also Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 345 (7th Cir. 1996) (plaintiff's failure to accept employer's reasonable accommodations rendered him unqualified under the ADA). Lucent argues that by rejecting its proposed accommodation – a modified work schedule that would have allowed Peirson to arrive at work one hour later (at 8:00 a.m.) and to leave one hour later in the afternoon (at 4:45 p.m.) – Peirson cannot be deemed a qualified individual with a disability. It is undisputed that the accommodation was offered and was rejected. Thus, if the modified work schedule was reasonable, Lucent is entitled to summary judgment.

Lucent adduces several convincing arguments to demonstrate the reasonableness of Goss's proposal. First, Lucent points to ADA regulations which specifically mention modified work schedules as an example of a reasonable accommodation. *See* 29 C.F.R. § 1630.2(o)(2)(ii) ("The term reasonable accommodation means . . . [j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities."). While helpful as far as it goes, this argument clearly is not dispositive: the regulations nowhere state that all modified work schedules are *ipso facto* reasonable.

Lucent also argues, however, that Peirson herself has essentially conceded that the

accommodation was reasonable. As noted above, Peirson asked that she be allowed to arrive fifteen minutes later on the mornings on which she had difficulty waking up. Similarly, in her response to Lucent's Rule 56.1 statement, Peirson agreed that she did not deserve an accommodation allowing her to arrive at work more than fifteen minutes late. As Lucent correctly observes, it is difficult to reconcile Peirson's contention that an accommodation of fifteen minutes would have been reasonable with her contention that an accommodation of a full hour was not reasonable.

For her part, Peirson fails to offer any evidence in support of her claim that the accommodation was not reasonable. First, while Peirson claims that Lucent's accommodation would only have increased her commute time, there is no evidence to suggest that Peirson ever attempted Lucent's proposal. Indeed, Peirson relies entirely on a declaration she submitted along with her brief in opposition to Lucent's summary judgment motion. The declaration states only that Peirson "has testified that the accommodation she was offered would not have helped her and was therefore not reasonable within the meaning of the ADA," because leaving home an hour later each day would simply have "increased her commute time due to traffic flows." It is well settled that a "plaintiff's conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment.'" *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429 (7th Cir. 2004) (internal quotation marks omitted); *Albiero*, 246 F.3d at 933 ("We repeatedly have held that '[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.'"); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993); *see also Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter

asserted.") (citation and quotation marks omitted).

Peirson's contention also fails to address the problem of inconsistency: if arriving at work fifteen minutes later was possible, arriving an hour later *a fortiori* would also have been possible. Peirson could have avoided any concern about increased "traffic flows" later in the morning simply by adjusting the time at which she began her commute. The fact that Peirson was permitted to begin work an hour later each day did not mean that she was necessarily required to begin her commute an hour later (when traffic presumably was heavier).[7]

In short, Peirson has not provided the court with sufficient evidence to create a genuine issue of material fact concerning the reasonableness of Lucent's proposed accommodation.[8] As a result,

---

[7] Lucent has moved to strike references to Peirson's declaration in her Rule 56.1 Response to Lucent's Statement of Materials Facts, arguing that they are conclusory and that they contradict her earlier deposition testimony. Tellingly, even in her opposition to the motion to strike, Peirson again offers only the following glib response: "It has been plaintiff's position throughout these proceedings, prior to these proceedings, and will be her position after these proceedings, that Michael Goss never offered plaintiff any reasonable accommodation." Mem. Law. Opp. Mot. to Strike at 5. Regardless of whether they are formally stricken, Peirson's statements are plainly insufficient to defeat Lucent's motion for summary judgment. Hence, Lucent's motion to strike is denied as moot.

[8] The fact that Lucent rejected Peirson's proposed accommodation (allowing her take FMLA time whenever she was tardy) does not change the court's analysis. First, Peirson's proposed accommodation would have left Lucent to wonder which days she would be arriving on time and which days she would be arriving late. Clearly, the ADA does not require employers to offer such an accommodation. As one court has observed, requesting that an employer "ignore its attendance policy and allow [an employee] to eliminate the essential job function of punctuality . . . is not reasonable or required under the ADA." *Holly v. Clairson Industries*, LLC, No. 5:05-cv-192-Oc-10GRJ, 2006 WL 1319442, at *8 (M.D. Fla. May 11, 2006). More importantly, the ADA does not obligate an employer to accede to the specific accommodation an employee requests; rather, the Act requires only that the employer provide the employee with some reasonable accommodation. *See, e.g.*, *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer. Accordingly, an employee who requests a transfer cannot dictate the employer's choice of alternative positions.") (internal citations omitted). Hence, so long as Lucent's

Peirson's rejection of Lucent's accommodation precludes her from being considered a "qualified individual with a disability" within the meaning of the ADA. Accordingly, Lucent is entitled to summary judgment.

**C.     Disability**

Putting aside Peirson's rejection of Lucent's proposed accommodation, Peirson's claim fails for a second reason: viewing the facts in the light most favorable to her, she cannot show that she is "disabled" within the meaning of the ADA. As noted above, the Act protects only qualified individuals with disabilities. In turn, a "disability" is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). As discussed more fully below, Peirson's claim fails under each subsection.[9]

   *1.     Actual Disability*

Under subsection (A), a disability is "a physical or mental impairment that *substantially limits* one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (emphasis added). In interpreting the provision, the Supreme Court has made clear that "to be substantially limited . . . an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and that "the impairment's impact must also be permanent or long term." *Toyota Motor Mfg., Kentucky,*

---

accommodation was reasonable – and the court concludes that it was – Lucent has not violated the ADA.

[9] Peirson makes no mention of subsection (B) in her response brief. As a result, the court limits its discussion to subsections (A) and (C).

*Inc. v. Williams*, 534 U.S. 184, 198 (2002).

The impact of Peirson's alleged impairment cannot be considered long-term. Indeed, the Seventh Circuit recently upheld a district court's grant of summary judgment in favor of a defendant where a plaintiff had alleged sleep difficulties of the same type and magnitude as those alleged here. *Scheerer v. Potter*, 443 F.3d 916, 920-21 (7th Cir. 2006). The plaintiff in *Scheerer* was a postmaster who had been diagnosed with Type 2 diabetes in 1993. *Id*. at 918. In 2002 and 2003, his conditioned worsened and he began insulin injections. *Id*. Scheerer eventually developed diabetic ulcers and complained, among other things, of reduced sex drive and difficulty in sleeping. *Id*. at 920-21. The record indicated that Scheerer had experienced difficulty in sleeping for approximately two years. Opening Brief Plaintiff-Appellant, Scott E. Scheerer at 29-30. Nevertheless, the court concluded that he had failed to establish that he suffered a substantial limitation, stating: "Scheerer's evidence pertaining to severe restrictions in his ability to sleep is also insufficient. Scheerer's evidence on sleeping difficulties establishes, at most, intermittent disrupted sleep, but it cannot establish the type of prolonged, severe and long-term sleep difficulties that can amount to a substantial limitation in the major life activity of sleeping."[10] *Id*. at 920-21; *see also Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (intermittent or treatable sleep difficulties that resulted from major depression did not substantially limit the major life activity of sleep).

Just so here. By Peirson's own account, her alleged condition lasted from August 2001 to

---

[10] Although *Scheerer* was brought under the Rehabilitation Act, the Seventh Circuit has made clear that the ADA and the Rehabilitation Act are nearly identical statutes and require substantially similar proof. *Grevas v. Village of Oak Park*, 235 F. Supp. 2d 868, 874 (N.D. Ill. 2002) (citing *Silk v. City of Chicago*, 194 F.3d 788, 798 n. 6 (7th Cir. 1999)).

November or December 2002 – a period significantly shorter than that in *Scheerer*.[11]  Pl.'s Mem. Opp. to Summ. Judgment ¶ 3.  Peirson concedes that she never experienced difficulty waking up prior to her move to Illinois in February 2001, and that after she "began treatment for the sleep disorder in November of 2002, the symptoms and debilitating condition have greatly subsided and have not returned."  *Id.* ¶ 12.  Even during this limited period, she experienced only intermittent difficulty in waking up: on most workdays, she successfully arrived at work on time.  By July 2003, Peirson's condition had been overcome to such an extent that she decided not to attend a follow-up appointment with Dr. Zallek.  Peirson currently experiences no symptoms associated with any sleep condition.  Under these circumstances, Peirson cannot be deemed "disabled" within the meaning of the ADA.

      2.      *Perceived Disability*

In addition, Peirson appears to argue that her claim can proceed on the basis of the fact that she was "regarded as" having a disability under subsection (C).  As an initial matter, Lucent argues that Peirson has waived any claim based on a regarded-as theory, since she failed to advance such a theory until the instant motion for summary judgment.  Indeed, Peirson's treatment of the issue in her briefs opposing summary judgment are so inchoate that the court is not entirely clear whether Peirson indeed wishes to maintain such a claim at this stage of the litigation.  In any event, assuming that Peirson wishes to advance such a claim, it fails.

Only a single paragraph of Peirson's response brief can be construed as offering support for

---

[11] According to the defendant's account, Peirson's sleeping problems lasted from February 2001 to November 2002.  The discrepancy between the exact time and duration of the alleged condition is no bar to summary judgment.  Indeed, Lucent's account ironically indicates that Peirson's difficulties lasted longer than Peirson's own account would indicate.

a regarded-as claim. Quoted in full, that paragraph is as follows:

> Although defendant attempts to argue that plaintiff was not disabled, and that her disorder was not disclosed to the defendant, the record demonstrates amply that this is not the case. Michael Goss, in his deposition, admits that he was aware that plaintiff regarded her problem as a medical problem, that he was aware she was seeking treatment for the problem, that the medical department attempted to assist her with the problem, and that she underwent a sleep study to attempt to diagnose her problem.

Response at 10.

These contentions, even when viewed in the light most favorable to Peirson, do not even come close to making out a regarded-as claim. In order to prevail on a perceived disability claim, it is not enough for the plaintiff to show that the defendant was aware of his impairment; a plaintiff must show further that the defendant knew of the impairment and believed that the plaintiff was *substantially limited* because of it. *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998); *see also Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 954 (7th Cir. 2000). The fact that Peirson thought her problem might be medical in nature clearly does not support the contention that Goss regarded her as disabled. Nor are Peirson's other contentions – that she sought treatment for her alleged sleeping problem, that she approached Lucent's medical department about the problem, and that she underwent a sleep study – sufficient to withstand summary judgment. There is no evidence that Goss ever learned the results of the sleep study, and it is undisputed that the physician who examined Peirson never was able to determine whether Peirson indeed suffered from a sleep condition. Pl.'s 56.1 ¶ 128. Plaintiff's citations to Goss's deposition show only that Peirson told him that her doctor thought she might have a sleep disorder and that she underwent a sleep study; they do not contain even the rudiments of a showing that Goss regarded Peirson as disabled, much less that Goss regarded Peirson as

*substantially limited* by an impairment. In sum, Peirson has not cited any evidence from which a reasonable juror could conclude that Goss or Lucent regarded Peirson as disabled.

## CONCLUSION

For the foregoing reasons, Lucent's motion for summary judgment is granted.


ENTER


_____
JOAN B. GOTTSCHALL
United States District Judge

Dated: Sept. 22, 2006